Exhibit 3

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
TWITTER, INC.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CASEY WEITZMAN, on behalf of herself and all others similarly situated,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* San Francisco - Civic Center Courthouse<br><br>400 McAllister St., San Francisco, CA 94102 | CASE NUMBER:<br>*(Número del Caso):*<br><br>**CGC-23-604035** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
(Eddie) Jae K. Kim, LYNCH CARPENTER, LLP, 117 East Colorado Blvd., Suite 600, Pasadena, CA 91105, Tel: (626) 550-1250

| | | | |
|---|---|---|---|
| DATE:<br>*(Fecha)* **01/17/2023** | Clerk, by<br>*(Secretario)* **JEFFREY FLORES** | | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.

2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

    under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
             ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
             ☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
             ☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(Eddie) Jae K. Kim (CA Bar No. 236805)
**LYNCH CARPENTER, LLP**
117 East Colorado Blvd., Suite 600
Pasadena, CA 91105
Tel.:    (626) 550-1250
ekim@lcllp.com

*Attorneys for Plaintiff and the Proposed Class*

[Additional Counsel Listed on Signature Page]

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**01/17/2023**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

## IN THE SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

**CGC-23-604035**

CASEY WEITZMAN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

TWITTER, INC.,

Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Casey Weitzman ("Plaintiff") brings this Class Action Complaint on behalf of herself, and all others similarly situated against Defendant Twitter, Inc. ("Twitter" or "Defendant"). The following allegations are based upon personal knowledge with respect to the Plaintiff's own acts, upon the investigation of counsel, upon information and belief as to all other matters:

**NATURE OF THE CASE**

1.      Plaintiff brings this class action against Twitter for its failure to properly secure and safeguard protected personally identifiable information, including without limitation, Twitter users' names, phone numbers, and email addresses (collectively, "PII") and for failing to comply with industry standards to protect information systems that contain PII. Plaintiff seeks, among other things, damages, orders requiring Twitter to fully and accurately disclose the nature of the information that has been compromised and to adopt reasonably adequate security practices and safeguards to prevent incidents like the disclosure in the future, and for Twitter to provide identity

theft protective services to Plaintiff and Class Members for their lifetimes, as Plaintiff and Class Members will be at an increased risk of identity theft due to the conduct of Twitter described herein.

2.      Twitter operates an online social media and social networking site through its website, www.twitter.com, and through its mobile application. Twitter allows registered users to communicate with one another by posting "tweets," or short messages, with which other users may interact through events such as a "like," reply, or "retweet."

3.      Twitter is a widely popular platform with millions of daily users sending over 500 million tweets per day.[1]

4.      On or about August 5, 2022, Twitter announced threat actors had leveraged a vulnerability in Twitter's system to scrape the public and private data of millions of Twitter users (the "Data Breach").[2]

5.      Based on public information available to date, the information impacted by the Data Breach includes registered Twitter users' public and private information, including names, phone numbers, email addresses, usernames, follower counts, and account creation data.[3]

6.      This information can be used to commit phishing attacks, crypto scams, and Business Email Compromise attacks directed at Plaintiff and Class Members.

7.      As a result of Twitter's failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII is now in the hands of cybercriminals. Plaintiff and Class Members face a substantial increased risk of identity theft, both currently and for the indefinite future. Consequently, Plaintiff and Class Members have had to spend, and will continue to spend, significant time and money to protect themselves due to Twitter's security failures.

---

[1] Salman Aslam, *Twitter by the Numbers: Stats, Demographics & Fun Facts*, Omnicore (Feb. 22, 2022), https://www.omnicoreagency.com/twitter-statistics/.
[2] *An Incident Impacting Some Account and Private Information on Twitter*, Twitter (Aug. 5, 2022), https://privacy.twitter.com/en/blog/2022/an-issue-affecting-some-anonymous-accounts; Lawrence Abrams, *Hacker Claims to be Selling Twitter Data of 400 Million Users*, BleepingComputer (Dec. 26, 2022), https://www.bleepingcomputer.com/news/security/hacker-claims-to-be-selling-twitter-data-of-400-million-users/.
[3] *Id.*

CLASS ACTION COMPLAINT

8.      Since the threat actor announced the Data Breach, Plaintiff has been required to spend her valuable time monitoring her various accounts in an effort to detect and prevent any misuses of her PII – time which she would not have had to expend but for the Data Breach.

9.      As a result of the Data Breach, Plaintiff will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

10.     Plaintiff, on behalf of herself and all others similarly situated, alleges claims for negligence, negligence *per se*, unjust enrichment, and declaratory judgment. Plaintiff seeks damages and injunctive relief, including the of adoption reasonably adequate security practices to safeguard the PII in Twitter's custody in order to prevent incidents like the Data Breach from reoccurring in the future.

## PARTIES

11.     Plaintiff Casey Weitzman is a citizen and resident of the County of Los Angeles, State of California.

12.     Plaintiff is a registered Twitter user and has had a Twitter account since approximately 2012. When creating her Twitter account, Plaintiff provided Twitter with PII, including her name, address, email address, date of birth, and other information. When creating her Twitter account and entrusting her PII to Twitter, Plaintiff reasonably expected that Twitter would take reasonable steps to safeguard his PII.

13.     Defendant Twitter, Inc., is Delaware corporation with its principal place of business at 1355 Market Street, Suite 900, San Francisco, County of San Francisco, State of California, 94103. At all relevant times, Twitter has operated its online social media and social networking service through its website, www.twitter.com, and through its mobile application.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over Defendant and the claims set forth below pursuant to Code of Civil Procedure § 410.10 and the California Constitution, Article VI § 10, because this case is a cause action not given by statute to other trial courts.

15.     Venue is proper in the Superior Court for the County of San Francisco, State of California because Defendant's principal place of business is located in this County, because

Defendant transacts substantial business in this County, and because a substantial part of the acts and/or omissions giving rise to this action occurred in, was directed to, and/or emanated from this County.

### STATEMENT OF FACTS

16.     Twitter is a popular online social media and social networking site on which users communicate in short messages called "tweets." Twitter's primary goal is to connect people and allow people to share their thoughts with a large audience.

17.     Registered users can tweet, "like," and "retweet" tweets and direct messages, while unregistered users can only view public tweets.

18.     Users intact with Twitter through a web browser or mobile frontline software, or programmatically via its Application Programming Interface ("API").[4]

19.     Twitter has millions of active users who use the platform to "comment on news, disseminate official pronouncements, organize campaigns and protests, or just let their friends know what's on their mind."[5] Indeed, Twitter has 38 million users in the United States alone.[6]

20.     Plaintiff, like millions of other registered Twitter users, created a Twitter account and entrusted Twitter with her personal information in order to create a Twitter account, and follow other accounts, and post, like, and retweet other tweets.

21.     In order to create a Twitter account, an individual must create their username and display name, and provide Twitter with their name, email address, phone number, date of birth, and other information.[7] Twitter uses an individual's phone number or email address for the purposes of verifying or authenticating the user's Twitter account.

22.     While an individual's display name and username are public, Twitter promises its registered users that their email addresses and phone numbers will not be publicly displayed on

---

[4] *About Twitter's APIs*, Twitter, https://help.twitter.com/en/rules-and-policies/twitter-api (last visited Jan. 3, 2023).
[5] Meltem Odabas, *10 Facts About Americans and Twitter*, Pew Research Center (May 5, 2022), https://www.pewresearch.org/fact-tank/2022/05/05/10-facts-about-americans-and-twitter/.
[6] Mansoor Iqbal, *Twitter Revenue and Usage Statistics (2022)*, Business of Apps (Nov. 4, 2022), https://www.businessofapps.com/data/twitter-statistics/.
[7] *Twitter Privacy Policy*, Twitter (June 10, 2022), https://twitter.com/en/privacy.

Twitter, even if they have enabled a setting that lets others find them by email address or phone number.[8]

23.    However, despite Twitter's representations that Plaintiff's and Class Members' PII would remain private, Twitter allowed a threat actor to scrape PII from millions of registered Twitter users' accounts and has since left its users without any clear idea of the extent of the PII compromised in the Data Breach, or how to protect themselves.

**A.    The Value of Private Information and Effects of Unauthorized Disclosure**

24.    As a social media company who holds an extremely valuable trove of user data, "including the contents of their direct messages and the social graph of who users have communicated and interacted with on the platform, as well as phone numbers, email addresses, and other potentially private details[,]" Twitter was well aware that the protected PII it collects and maintains is highly sensitive and of significant value to those who would use it for wrongful purposes.[9]

25.    "Personal Data is currency in the Information Age and is being traded to the tune of billions of dollars globally – and increasing each year as the more personal data is analysed [sic], categorised [sic] and linked."[10]

26.    PII carries immense value to not only companies and social media platforms, but also to cybercriminals who seek to steal PII for a variety of reasons including blackmail, identity theft, extortion, and sale on underground internet websites, commonly referred to as the "dark web."[11]

---

[8] *About Your Email and Phone Number Discoverability Privacy Setting*, Twitter, https://help.twitter.com/en/safety-and-security/email-and-phone-discoverability-settings#:~:text=Will%20my%20email%20address%20or,email%20address%20or%20phone%20number (last visited Jan. 3, 2023).
[9] Lily Hay Newman, *Here's How Bad a Twitter Mega-Breach Would Be*, Wired (Nov. 17, 2022), https://www.wired.com/story/twitter-mega-breach-what-if/.
[10] *The Value of Personal and Private Data*, Digital Control Room, https://www.digitalcontrolroom.com/the-value-of-personal-and-private-data/ (last visited Jan. 3, 2023).
[11] *How Much is Your Data Worth? The Complete Breakdown for* 2021, Invisibly (Jul. 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/.

27.    Indeed, cybercriminals can use stolen PII to target individuals with phishing and other social engineering attacks and to distribute malware.[12] As such, Wired has explained:

> [a] breach of Twitter could expose the company or users in myriad ways. Of particular concern would be an incident that endangers users who are activists, dissidents, or journalists under a repressive regime. With more than 230 million users, a Twitter breach would also have far-reaching potential consequences for identity theft, harassment, and other harm to users around the world. And from a government intelligence perspective, the data has already proved valuable enough over the years to motivate government spies to infiltrate the company . . . .[13]

28.    The ramifications of Twitter's failure to keep Plaintiff's and Class Members' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

29.    Further, cybercriminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available.

30.    Twitter knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its data security systems were breached. Twitter failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring, resulting in the theft of PII Plaintiff and Class Members entrusted to Twitter.

**B.    Twitter Demonstrates a Reckless Disregard for Data Security**

31.    As a social media company with substantial influence on the lives of millions of Twitter users around the world, Twitter has an obligation to securely maintain the user data that it receives and keep it safe from harm. Twitter knows that PII is a prime target for cybercriminals. Yet, Twitter has major security problems that pose a threat to its users' PII.

32.    Twitter has faced scrutiny from the Federal Trade Commission ("FTC") about its data security practices and mishandling of user data. In 2010, the FTC filed a complaint against Twitter for its "mishandling of users' private information and the issue of too many employees

---

[12] Ravi Sen, *Here's How Much Your Personal Information is Worth to Cybercriminals – and What They Do With It*, PBS (May 14, 2021), https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it.
[13] Newman, *supra* note 9.

having access to Twitter's central controls."[14] The complaint resulted in a consent order in which "Twitter vowed to clean up its act, including by creating and maintaining 'a comprehensive information security program.'"[15]

33.     In the years following the consent decree, Twitter proceeded to misrepresent the security and privacy of its users' data, and was later fined $150 million dollars by the FTC in May of 2022 for violating the consent decree.[16] "Specifically, [the FTC claimed] while Twitter represented to users that it collected their telephone numbers and email addresses to secure their accounts, Twitter failed to disclose that it also used user contact information to aid advertisers in reaching their preferred audiences."[17]

34.     Twitter has also "seemingly neglected security for a very long time," leaving its security practices dangerously lacking.[18] For instance, in May 2018, "Twitter advised every user to change their password after the company discovered a bug that left passwords exposed in an internal system. While there was no evidence of a breach or misuse, the passwords were unencrypted in an internal log, making them readable to anyone who accessed that system."[19]

35.     Then in 2020, Twitter accounts belonging to Joe Biden, Bill Gates, and other prominent users were compromised after a social engineering attack successfully targeted Twitter employees with access to the company's internal controls.[20] The attack was ultimately used to post tweets promoting a cryptocurrency scam.[21]

36.     More recently, however, in the Summer of 2022, Twitter's former chief security officer, Peiter Zatko, provided a whistleblower complaint to various government agencies asserting

---

[14] Donie O'Sullivan, Clare Duffy, & Brian Fung, *Ex-Twitter Exec Blows the Whistle, Alleging Reckless and Negligent Cybersecurity Policies*, CNN (Aug. 23, 2022), https://www.cnn.com/2022/08/23/tech/twitter-whistleblower-peiter-zatko-security/index.html.
[15] *Id.*
[16] Rebecca Bellan, *Twitter Agrees to Pay $150M for Breaking Privacy Promises*, TechCrunch (May 25, 2022), https://techcrunch.com/2022/05/25/twitter-agrees-to-pay-150m-for-breaking-privacy-promises/.
[17] *Id.*
[18] Newman, *supra* note 9.
[19] Michael X. Heillgenstein, *Twitter Data Breaches: Full Timeline Through 2022*, Firewall Times (Dec. 9, 2022), https://firewalltimes.com/twitter-data-breach-timeline/.
[20] Rishi Iyengar, *Twitter Blames 'Coordinated' Attack on its Systems for Hack of Joe Biden, Barack Obama, Bill Gates, and Others*, CNN (July 16, 2022), https://www.cnn.com/2020/07/15/tech/twitter-hack-elon-musk-bill-gates/index.html.
[21] *Id.*

that Twitter has major security problems that pose a threat to its users' personal information.[22] Indeed, the whistleblower report "paints a picture of a chaotic and reckless environment at a mismanaged company that allows too many of its staff access to the platform's central controls and most sensitive information without adequate oversight."[23]

37.     The most concerning allegation from Zatko's disclosure was that there is minimal monitoring and logging of Twitter's software platform, leaving "an opening for someone with unintended access or malign intentions to view user data or even make changes to the platform without raising alarms or leaving a clear trail."[24]

38.     Zatko's concerns were not unfounded. In January 2022, Twitter received a report that an API vulnerability could allow attackers to feed email addresses or phone numbers into Twitter's API and get an associated Twitter ID for a registered account.[25]

39.     A Twitter ID is a unique value that is given to every object within Twitter, including Twitter accounts.[26] No two people have the same Twitter ID and an account can never change its Twitter ID.

40.     By the time Twitter remediated the API vulnerability in January of 2022, threat actors had already utilized the vulnerability in December 2021 to scrape information from the accounts of 5.4 million Twitter users to create user records containing both private and public information.[27] The scraped information contains a wealth of information, including Twitter users' email address, phone number, Twitter ID, name, screen name, verified status, location, URL, description, follower count, account creation date, friends count, favorites count, statuses count, and profile image URLs.[28]

---

[22] O'Sullivan, et al., *supra* note 14.
[23] *Id.*
[24] Lily Hay Newman, *The Most Damning Allegation in the Twitter Whistleblower's Report*, Wired (Aug. 23, 2022), https://www.wired.com/story/mudge-twitter-whistleblower-security/.
[25] Bill Toulas, *Twitter Confirms Recent User Data Leak is From 2021 Breach*, BleepingComputer (Dec. 12, 2022), https://www.bleepingcomputer.com/news/security/twitter-confirms-recent-user-data-leak-is-from-2021-breach/.
[26] *Twitter IDs*, Twitter, https://developer.twitter.com/en/docs/twitter-ids#:~:text=with%20your%20CMS-,Twitter%20IDs,they%20could%20be%20generated%20sequentially.
[27] Toulas, *supra* note 25.
[28] Lawrence Abrams, *5.4 Million Twitter Users' Stolen Data Leaked Online – More Shared Privately*, BleepingComputer Nov. 27, 2022), https://www.bleepingcomputer.com/news/security/54-million-twitter-users-stolen-data-leaked-online-more-shared-privately/.

41.     The threat actor then began selling the scraped information on a hacking forum for $30,000 and ultimately shared the account information for free on November 24, 2022.[29] Twitter was unaware that its API vulnerability had been leveraged until a press report announced the dataset offering.[30] Put differently, Twitter's data security measures are seemingly insufficient to detect the malicious scrapping of user data from its own API.

42.     Following the first data release of 5.4 million Twitter users' PII , security expert Chad Loder announced that Twitter and suffered a second, larger data scrape, that resulted in a second release of the information 17 million Twitter users.[31]

43.     Just like the first data release, the user data was collected using the same API vulnerability in December 2021,and consisted of personal phone numbers, verified status, account names, Twitter IDs, and screen names.[32]

44.     While the data scraped from the second data breach is private and not being sold,[33] none of the phone numbers present in the first leaked data set were present in the second data set, indicating that there is a large amount of user data circulating among threat actors.[34]

45.     After news reports of the massive data releases, the Irish Data Protection Commission ("DPC") announced that it would be launching an investigation into the API vulnerability that resulted in the release of data affecting 5.4 million Twitter users. The DPC serves as Twitter's European Union Watchdog.[35]

46.     In a statement, the DPC said that it "corresponded with Twitter International Unlimited Company ("TIC") in relation to a notified personal data breach that TIC claims to be the source vulnerability used to generate the datasets and raised queries in relation to GDPR

---

[29] *Id.*
[30] *An Incident Impacting Some Account and Private Information on Twitter*, Twitter (Aug. 5, 2022), https://privacy.twitter.com/en/blog/2022/an-issue-affecting-some-anonymous-accounts.
[31] Sergui Gatlan, *Massive Twitter Data Leak Investigated by EU Privacy Watchdog*, Bleeping Computer (Dec. 23, 2022), https://www.bleepingcomputer.com/news/security/massive-twitter-data-leak-investigated-by-eu-privacy-watchdog/.
[32] *Id.*
[33] Abrams, *supra* note 2.
[34] Abrams, *supra* note 27.
[35] Gatlan, *supra* note 31.

CLASS ACTION COMPLAINT

compliance."[36] The DPC added that it believes "one or more provisions of the GDPR and/or the Act may have been, and/or are being, infringed in relation to Twitter Users' personal data."[37]

47.     The DPC has previously fined Twitter $550,000 for failing to notify the DPC of a data breach within the 72-hour timeframe required by the GDPR and for inadequate documentation of the data breach.[38]

48.     The DPC has also previously fined Meta Platform's €625 million for a major data breach that exposed the personal information of hundreds of millions of Facebook users worldwide. not protecting Facebook users' data from scrappers.[39] The Meta data breach was similar to Twitter's, in that threat actors leveraged an API vulnerability to scrape personal information from Facebook accounts, including users' phone numbers, Facebook IDs, names, genders, locations, relationship statuses, occupations, dates of birth, and email addresses.[40] The Facebook data was then shared on a hacking forum, allowing the released data to be used for targeted attacks.[41]

**C.      Twitter Breached its Duty to Safeguard Users' PII**

49.     Following the second data release, on or around December 23, 2022, a new threat actor claimed to be selling public and private data of over 400 million Twitter users, asking $200,000 for an exclusive sale.[42] If an exclusive sale was not made, the threat actor warned they would sell copies to multiple people for $60,000 per sale.[43]

50.     The threat actor also linked to the post an explanation of how the scraped information could be abused by other threat actors to commit phishing attacks, crypto scams, and Business Email Compromise attacks.[44]

51.     The threat actor claimed to have collected the data in December 2021 using Twitter's API vulnerability, that was previously associated with the first data release affecting 5.4 million

---

[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] Bill Toulas, *Meta fined €625 for not protecting Facebook users' data from scrapers*, BleepingComputer (Nov. 28, 2022), https://www.bleepingcomputer.com/news/security/meta-fined-265m-for-not-protecting-facebook-users-data-from-scrapers/.
[40] *Id.*
[41] *Id.*
[42] Abrams, *supra* note 2.
[43] *Id.*
[44] *Id.*

CLASS ACTION COMPLAINT

Twitter users and the second data release affecting 17 million Twitter users.[45] The API vulnerability allowed the threat actor "to feed large lists of phone numbers and email addresses into a Twitter API and receive an associated Twitter user ID. The threat actor then used this ID with another IP to retrieve the public profile data for the users, building a Twitter user profile consisting of public and private data."[46]

52.     The threat actor's post included sample data for thirty-seven politicians, journalists, corporations, and government agencies, including Twitter users' email addresses, names, usernames, follower count, creation data, and phone numbers.[47] Cybersecurity experts have independently confirmed that the leaked sample data appears legitimate.[48]

53.     Following the third data release, on January 4, 2023, the threat actor then released a dataset consisting of 200 million Twitter profiles on the Breached hacking forum for eight credits of the forum's currency, worth, approximately $2.[49] The leaked information appears similar to the leaked dataset advertised on hacking forums containing the alleged 400 million records, but slimmed down to eliminate duplicate records.[50] The recently leaked information includes email addresses, phones numbers, usernames, follower counts, and account creation dates.[51]

54.     The leaked user data can be valuable to "hackers who can use the information as part of password-reset attempts and account takeovers. The risk is particularly high for individuals who use the same account credentials on Twitter as they do for other digital services such as banks or cloud storage, researchers said, because hackers could take information gleaned from the leak to pry open user accounts elsewhere."[52]

---

[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] Lawrence Abrams, *200 Million Twitter Users' Email Addresses Allegedly Leaked Online*, BleepingComputer (Jan. 4, 2023), https://www.bleepingcomputer.com/news/security/200-million-twitter-users-email-addresses-allegedly-leaked-online/.
[50] *Id.*
[51] *Id.*
[52] Brian Fung, *Hackers post email addresses linked to 200 million Twitter accounts, security researchers say*, CNN (Jan. 5, 2023), https://www.cnn.com/2023/01/05/tech/twitter-data-email-addresses/index.html.

55.     Further, the widespread circulation of the released user data "creates the risk that it will fuel phishing attacks, identity theft attempts, and other individual targeting."[53]

56.     Upon information and belief, Plaintiff's PII was scraped from Twitter's API during the Data Breach.

57.     Upon information and belief, like Plaintiff, Class Members' PII was also scraped from Twitter's API during the Data Breach.

**D.     Twitter Violated FTC Guidelines.**

58.     Twitter is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

59.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[54]

60.     The FTC provides cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[55]

61.     The FTC further recommends that companies maintain PII for no longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on

---

[53] Lilly Hay Newman, *What Twitter's 200 Million-User Email Leak Actual Means*, Wired (Jan. 6, 2023), https://www.wired.com/story/twitter-leak-200-million-user-email-addresses/.

[54] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[55] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

the network; and verify that third-party service providers have implemented reasonable security measures.[56]

62.     The FTC has brought enforcement actions against businesses, including Twitter, for failing to adequately and reasonably protect customer data, wherein the FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63.     Twitter failed to properly implement basic data security practices. Twitter's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

64.     Twitter was at all times fully aware of its obligations to protect the PII of consumers because of its position as a large technology company who collects large swaths of PII from its users. Twitter was also aware of the significant repercussions that would result from its failure to do so, especially in light of the two previous FTC enforcement actions against Twitter for its misuse of Twitter users' personal information.

**E.     Plaintiff and Class Members Suffered Damages**

65.     The ramifications of Twitter's failure to keep PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. Plaintiff and Class Members now face years of constant surveillance of their personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to damages incurred from any fraudulent use of their PII.

66.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's malfeasance. Further, the value of Plaintiff and Class Members' PII has been diminished by its exposure in the Data Breach.

---

[56] *Id.*

67.     Plaintiff and Class Members are at a substantially increased risk of suffering identity theft and fraud or misuse of their PII as a result of the Data Breach. From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[57]

68.     Besides the monetary damage sustained in the event of identity theft, Plaintiff and Class Members may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[58]

69.     Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its users' PII.

70.     Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers.

71.     As a result of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable PII; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their PII being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their PII; and continued risk to Plaintiff's and the Class Members' PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII that was entrusted to it.

---

[57] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited Jan. 3, 2023).
[58] Kathryn Parkman, *How to Report identity Theft*, ConsumerAffairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html.

1

**CLASS ALLEGATIONS**

2      72.     Plaintiff brings this case individually and, pursuant to California Code of Civil

3  Procedure section 382, on behalf of herself and a class of similarly situated individuals ("Class")

4  defined as:

5          All individuals in the United States whose PII was compromised in the Twitter Data
           Breach which occurred on or about December 2021.
6

7      73.     Excluded from the Class is Defendant, their subsidiaries and affiliates, their officers,

8  directors and members of their immediate families and any entity in which Defendant has a

9  controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party,

10  the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

11      74.     Plaintiff reserves the right to modify or amend the definition of the proposed Class,

12  if necessary, before this Court determines whether certification is appropriate.

13      75.     **Numerosity.** There are, at a minimum, millions of members of the Class described

14  above. The exact size of the Class and the identities of the individual members thereof are

15  ascertainable through Defendant's records, including but not limited to, the files implicated in the

16  Data Breach.

17      76.     **Existence and Predominance of Common Questions of Law and Fact.** There is a

18  well-defined community of interest and there are common questions of fact and law affecting

19  members of the Class, which predominate over questions affecting individual Class members. The

20  questions of fact and law common to the Class include, but are not limited to, the following:

21          a.      Whether and to what extent Defendant had a duty to protect the PII of

22  Plaintiff and Class Members;

23          b.      Whether Defendant was negligent in collecting and storing Plaintiff's and

24  Class Members' PII;

25          c.      Whether Defendant had a duty not to disclose the PII of Plaintiff and Class

26  Members to unauthorized third parties;

27          d.      Whether Defendant took reasonable steps and measures to safeguard

28  Plaintiff's and Class Members' PII;

e.      Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

f.      Whether Defendant breached its duty to exercise reasonable care in handling Plaintiff's and Class Members' PII by failing to comply with industry standards;

g.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members of the scope of their PII compromised by the Data Breach;

i.      Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct;

j.      Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

k.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

77.      **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same failure by Defendant to safeguard PII. Plaintiff and members of the Class were each registered Twitter users, each having their PII obtained by an unauthorized third party.

78.      **Adequacy.** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

79.      **Superiority.** The claims of Plaintiff and the Class members are substantially identical as explained above. While the aggregate damages that may be awarded to the members of

the Class are likely to be substantial, the damages suffered by the individual members of the Class are relatively small.   As a result, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them. Certifying the case as a Class will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class. Defendant's uniform conduct is generally applicable to the Class as a whole, making relief appropriate with respect to each Class member.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

80.     Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

81.     Twitter owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty including, among other things: (a) designing, maintaining, and testing Twitter's security systems to ensure that Plaintiff's and Class Members' PII in Twitter's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

82.     Twitter had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by cybercriminals for unauthorized access, Twitter was obligated to act with reasonable care to protect against these foreseeable threats.

83.     Twitter breached the duty owed to Plaintiff and Class Members and thus was negligent. Twitter breached its duty by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff and Class Members; (b) detect the Data Breach while it was ongoing; (c) maintain security systems consistent with industry standards; and (d) disclose that Plaintiff's and Class Members' PII in Twitter's possession had been or was reasonably believed to have been, stolen, or compromised.

84.     But for Twitter's wrongful and negligent breach of its duty owed to Plaintiff and Class Members, their PII would not have been compromised.

85.     As a direct and proximate result of Twitter's negligence, Plaintiff and Class Members have suffered injuries, including:

a.     Theft of their PII;

b.     Costs associated with requested credit freezes;

c.     Costs associated with the detection and prevention of identity theft and unauthorized use of the PII;

d.     Costs associated with purchasing credit monitoring and identity theft protection services;

e.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.     Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

g.     The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of cyber-criminals;

h.     Damages to and diminution in value of their PII entrusted, directly or indirectly, to Twitter with the mutual understanding that Twitter would safeguard Plaintiff's

and Class Members data against theft and not allow access and misuse of their data by others; and

        i.        Continued risk of exposure to hackers and thieves of their PII, which remains in Twitter's possession and is subject to further breaches so long as Twitter fails to undertake appropriate and adequate measures to protected Plaintiff.

86.      As a direct and proximate result of Twitter's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**Negligence Per Se**
**(On Behalf of Plaintiff and the Class)**

87.      Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

88.      Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Twitter for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Twitter's duty.

89.      Twitter violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures and comply with the industry standards to protect PII. Twitter's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach within the technology industry.

90.      Twitter's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

91.      Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

92.      Moreover, the harm that has occurred is the type of harm that the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data

security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

93.     As a direct and proximate result of Twitter's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

94.     Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

95.     Plaintiff and Class Members have an interest, both equitable and legal, in their PII that was conferred upon, collected by, and maintained by Twitter and ultimately stolen in the Data Breach.

96.     Twitter was benefitted by the conferral upon it of the PII pertaining to Plaintiff and Class Members and by its ability to retain and use that information. Twitter understood that it was in fact so benefitted.

97.     Twitter also understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Twitter maintaining the privacy and confidentiality of that PII.

98.     But for Twitter's willingness and commitment to maintain its privacy and confidentiality, that PII would not have been entrusted with Twitter. Further, if Twitter had disclosed that its data security measures were inadequate, Twitter would not have been permitted to continue in operation by regulators and participants in the marketplace.

99.     As a result of Twitter's wrongful conduct as alleged in this Complaint, including among other things, its utter failure to employ adequate data security measures, its continued maintenance and use of the PII belonging to Plaintiff and Class Members without having adequate data security measures, and its other conduct facilitating the theft of that PII, Twitter has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

100.    Twitter's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class Members'

sensitive PII, while at the same time failing to securely maintain that information from intrusion and theft by hackers and identify thieves.

101.    Under the common law doctrine of unjust enrichment, it is inequitable for Twitter to be permitted to retain the benefits it received, and is still receiving from the use of Plaintiff and Class Members' PII. Twitter's retention of such benefits constitutes unjust enrichment.

102.    The benefit conferred upon, received, and enjoyed by Twitter was not conferred officiously or gratuitously, and it would be inequitable and unjust for Twitter to retain the benefit.

103.    Twitter is therefore liable to Plaintiff and Class Members for restitution in the amount of the benefit conferred on Twitter as a result of its wrongful conduct, including specifically the value to Twitter of the PII that was stolen in the Data Breach and the profits Twitter received from the use of that information.

**FOURTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*,**
**Based on "Unfair" and/or "Unlawful" Acts and Practices**
**(On Behalf of Plaintiff and the Class)**

104.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

105.    Plaintiff brings this claim on behalf of herself and the Class pursuant to the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.

106.    Plaintiff and Twitter are "persons" within the meaning of Cal. Bus. & Prof. Code § 17201.

107.    The UCL prohibits unfair competition, which includes an "unlawful, unfair or fraudulent" act or practice.  Cal. Bus. & Prof. Code § 17200.

108.    Under the UCL, any business act or practice that is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

109.    The violation of any law constitutes an unlawful business practice under the UCL.

110.    Twitter engaged in unfair and unlawful business practices prohibited by the UCL by unreasonably adopting and maintaining data security measures that were inadequate to protect

Plaintiff's and the Class' PII and prevent the Data Breach.  These unfair and unlawful practices occurred repeatedly in connection with Twitter's trade or business.

111.    Twitter's affirmative acts in adopting and maintaining inadequate data security measures are unfair within the meaning of the UCL, because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers and businesses, and provided no benefit to consumers or competition.

112.    Twitter's implementation of inadequate data security measures also was unfair within the meaning of the UCL, because its conduct undermined California public policy that businesses protect personal and financial information as reflected in Article I, Section 1 of the California Constitution (enacted because of private sector data processing activity and stating that all people have an inalienable right to privacy) and in statutes such as the Online Privacy Protection Act, Cal. Bus. & Prof. Code § 22578 (explaining that the Legislature's intent was to have a uniform policy statewide regarding privacy policies on the Internet); the Information Practices Act, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a)(1) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); and the FTC Act, 15 U.S.C. § 45(a)(1), which prohibits unfair trade practices.

113.    Twitter's violations of the California Customer Records Act, Cal. Civ. Code § 1798.81.5(b) (the "California Customer Records Act"), moreover, constitute unlawful acts or practices under the UCL.  The California Customer Records Act requires a "business that owns, licenses, or maintains personal information about a California resident" to "implement and maintain reasonable security procedures and practices appropriate to the nature of the information" and "to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."  Twitter failed to implement and maintain such reasonable security procedures and practices before and at the time of the Data Breach.  As a result, Twitter violated the California Customer Records Act, Cal. Civ. Code § 1798.81.5(b).

114.    Twitter's violations of the FTC Act, 15 U.S.C. § 45(a)(1), as alleged herein, also constitute unlawful acts or practices under the UCL.

115.    Plaintiff and the Class reasonably expected Twitter to maintain secure networks, adhere to industry standards, and otherwise use reasonable care to protect Plaintiff's and the Class' PII, which contains their personal, private information.

116.    Twitter's conduct harmed competition.  While Twitter cut corners and minimized costs, its competitors spent the time and money necessary to ensure PII was appropriately secured and safeguarded.  Further, the injuries suffered by Plaintiff and the Class are not outweighed by any countervailing benefits to consumers or competition.  And, because Twitter is solely responsible for securing its networks and protecting its customers' PII, there is no way Plaintiff or the Class could have known about Twitter's inadequate data security practices or avoided the injuries they sustained. There were reasonably available alternatives to further Twitter's legitimate business interests, other than its conduct responsible for the Data Breach.

117.    Twitter willfully engaged in the unfair and unlawful acts and practices described above and knew or should have known that those acts and practices were unfair and unlawful in violation of the UCL.

118.    As a direct and proximate result of Twitter's unfair and unlawful practices and violation of UCL, Plaintiff and the Class have suffered and will continue to suffer substantial injury and ascertainable loss and are entitled to equitable and such other relief as this Court considers necessary and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of herself and all other similarly situated, prays for relief as follows:

a.    For an order certifying the Class under California Code of Civil Procedure Section 382 and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c.    For damages in an amount to be determined by the trier of fact;

1       d.     For an order of restitution and all other forms of equitable monetary relief;

2       e.     Declaratory and injunctive relief as described herein;

3       f.     Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

4       g.     Awarding pre- and post-judgment interest on any amounts awarded; and,

5       h.     Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

A jury trial is demanded on all claims so triable.

Dated: January 16, 2023        */s/ (Eddie) Jae K. Kim*

                (Eddie) Jae K. Kim (CA Bar No. 236805)
**LYNCH CARPENTER, LLP**
117 East Colorado Blvd., Suite 600
Pasadena, CA 91105
Telephone: (626) 550-1250
ekim@lcllp.com

Gary F. Lynch (*pro hac vice* forthcoming)
Jamisen A. Etzel (*pro hac vice* forthcoming)
Nicholas A. Colella (*pro hac vice* forthcoming)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412.322.9243
Facsimile: 412.231.0246
gary@lcllp.com
jamisen@lcllp.com
nickc@lcllp.com

Joseph P. Guglielmo (*pro hac vice* forthcoming)
Amanda Rolon (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
arolon@scott-scott.com

E. Kirk Wood (*pro hac vice* forthcoming)
**WOOD LAW FIRM, LLC**
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone: (205) 908-4906
kirk@woodlawifrmllc.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT